P.P.G. Industries, Inc. v. Valspar Sourcing, Inc. Mr. Feig. Thank you, Your Honor. Good morning, Your Honors. May it please the Court. Your Honor, this case can be decided on the basis of legal errors by the Board, not factual errors. Mr. Feig, could you start with standing? Yes. I'm a little concerned. I saw that you addressed it at the very end of your grave brief, but I'd like to hear you speak on it a bit more. We were a bit surprised that standing was raised, Your Honor. Have you been accused of infringing this patent? Actually, P.P.G., shortly after the last brief was filed, was sued for patent infringement by Valspar on progeny, very closely related patents. But not on this patent? Not on these patents that are involved here. Are they related? You said closely related. How are they related? Are they like parent-child? Yes. They're child patents. I think it's clear that P.P.G. and Valspar are competitors in this business. There's a statutory basis for this appeal. I know the Court is very much aware of that. The Consumer Watchdog case and other cases have said the standing requirements are relaxed in that situation. They're not eliminated. Here it's very clear that P.P.G. has a bona fide, genuine interest in the technology of these patents. In fact, almost all of the patents that are discussed in the briefs as prior art or as arguments that Valspar makes as to why this coding limitation, flexibility limitation should be in the claims are P.P.G. patents. It demonstrates P.P.G. has a very legitimate... But the concern I had was in your gray brief, you were referencing how Perez is something from P.P.G. Perez? Perez, yes. Perez. But the Dr. Swarup declaration was talking about how P.P.G. was using that particular coding 25 years ago. So I was concerned that the gray brief was artfully drafted in a way that perhaps you were saying, okay, 25 years ago, we made this kind of coding, but the gray brief doesn't go further to say we're presently making this coding or we are in the process of making this coding or we are trying to decide between one of two codings, either X or Perez, and therefore we need to have a freedom to operate understanding here. So there were all... I didn't see any of that in your gray brief, and so I need some clarification here. There was a document that was cited in the gray brief. But that's a 2013 PowerPoint. The 2013 PowerPoint that shows that P.P.G. has an ongoing program to develop these kinds of CAN interior codings. I have a concern about that one, though, because it's three years ago. So can you talk about what P.P.G. is doing now? Well, as I say, P.P.G. now has been sued for patent infringement for developing and commercializing its CAN interior coding. So P.P.G. is currently making a CAN interior coding, and it has been sued by Valspar based on patents that are child patents to the patent at issue here. Yes. P.P.G., I don't want to misspeak whether they are actually selling them or they are in final stages of development in the U.S., I'm not sure. I know they are selling them in Europe, and there's also litigation about the European patents going on in Europe. Is the lawsuit in Europe or the United States? The United States. Let's turn to the merits of the appeal. Thank you, Your Honor. Well, as I said, I think this case can turn on legal issues, not factual issues, and I'd like to focus on two of those during my remarks here today, subject to any additional issues the court would like to discuss. First, the board contravened decades of this court's precedent. When it relied on an admittedly unclaimed property, this coding flexibility, to reverse the examiner's determination that the claimed invention would have been obvious over the combination of the Perez patent and the Christensen patent, both formed by P.P.G. Second, the board erred as a matter of law in construing the claims by reading this coding flexibility requirement into the claims. This claim construction infected the entire board decision, and the board read into the claims this flexibility requirement, while at the same time reading out of the claims what the patents at issue here, the Valspar patents, called preferred embodiments or preferred codings of the invention. Now, the only facts that are important to these issues are facts that are not disputed. There is no dispute that the Perez codings meet the compositional requirements of the Valspar patent claims. So they claim the use of the Perez codings. There's no dispute that the board relied entirely on extrinsic evidence to find this so-called coding flexibility requirement. And at the end of the day, there is no dispute about the meaning of the claims. Valspar made unequivocal statements in its brief that the claims are not limited to coding flexibility. Well, let me try a hypothetical. What if someone is doing some kind of drug discovery plan, and then there is a compound that they choose to be a lead compound, and it's really close to what is ultimately the patented compound. But everybody is under the belief that that lead compound is poisonous. Right? You know, just because the patent claim doesn't say, you know, the following composition that, by the way, is not poison, it seems like that's a relevant consideration to the obviousness inquiry in trying to figure out whether one of ordinary skill in the art would look at that prior art lead compound and want to modify it to render obvious the ultimate patented compound. Your hypothetical might not be so hypothetical, Your Honor. I think those were facts that were very similar to the Bristol-Myers versus Teva case. But the law precedent doesn't require that you move into the claim all of the things that are in the specification, whether it might be known or the comparisons. How much does your argument depend on what's in the claim as opposed to what's described as a property of the product? Your Honor, just following up on Judge Chin's argument, I think it's the same question. I think that the claims control the obviousness determination, and if you're claiming a drug, you might argue that that claim does have some limitation about toxicity in it, maybe not expressly, but inherently. This court's jurisprudence, I think, has always been firmly anchored, the obviousness jurisprudence has always been firmly anchored in what is claimed. If the court were to accept the invitation that you can base obviousness on desirable properties of a commercial product that are not required by the claims, which is what's going on here, you would never know where to stop. I mean, you would be flooded with arguments and expert testimony about properties that have nothing to do with what the invention actually claims. Now, this court has spoken to this issue, and just to refer to a few comments in the court quoted the earlier Allergan versus Apotex and said, quote, failure to consider the appropriate scope of the patent's claimed invention in evaluating the reasonable expectation of success constitutes a legal error that is reviewed without deference. On that same page, which was page 1367 of 821F3rd, the court said, one must have a motivation to combine accompanied by a reasonable expectation of achieving what is claimed in the patent at issue. But you don't put that in the claim? I'm sorry? You don't put that in the claim? You don't put your motivation in the claim? No, but you put the limitations on which you're basing your patentability argument or your non-obviousness argument. I mean, when you stand back and think about what's being said here, it is that our claims are patentable over Perez because Perez allegedly doesn't have this required flexibility. Yet our claims don't require flexibility. And in fact, preferred embodiments in our patent application don't have flexibility. Your claims say that it has to be on a can. So Perez has the coating, but Perez doesn't say it would be on the interior of a can. And then the secondary reference says you can use this coating on it and put a coating on the interior of the can. But there's one of the things to put something on the interior of the can, and there's evidence of this, which we are reviewing for substantial evidence. And the evidence is that one of ordinaries would know that if you're going to put a coating on the interior of a can, it should be flexible. So that if the can gets dented, it doesn't flake off and the person eats it. So, I mean, why is that not supported by substantial evidence? Your Honor, I come back to it has to be grounded in the claims. And this Court has said that over and over and over again.  I'm sorry? The foundation, the characteristic that's being used to try to distinguish the prior art. Now, Your Honor, the claims here are extremely broad. They're very broad both in terms of the definition of the coating composition that's used, and they're very broad in terms of the applications for which that composition is used. The claims read on Perez, there's no dispute. And the only ground that the Court gave for saying there was no motivation to combine or no reasonable expectation of success was that Perez allegedly lacked sufficient flexibility. No, it said it's not on the inside surface of a food can. And so then there had to turn to the secondary reference. I'm sorry, I missed that, Your Honor. The inside surface of a can. The claim says a method of coating an inside surface of a food or a beverage can. Right? Yes. Perez doesn't teach that. Well, Perez teaches the exact same compositions that are used in the Valspar patents, that are claimed in the Valspar patents. The patent examiner, the reexamination board said, if I look at Perez, it has the characteristics that make it suitable for an inside coating for a can. If I look at Christensen, it tells you how to use that coating for coating the inside of a can. The board did not... When you say that coating, which coating? The Perez coating. The Christensen reference says... No, it doesn't reference Perez. But what the examiner said... It just says you can use a coating on the inside of a can. The examiner said you can use the Perez coating in the Christensen method to coat the inside of a can. And that that was obvious. And I would submit, Your Honor, the board did not disturb that conclusion. The board did not address that conclusion by the examiner at all. What the board said was, we buy into the fact that the Perez coating is not sufficiently flexible. And that was the entire basis for the board's decision. It was basing non-obviousness on something that is nowhere in the claims, which is contrary to decades of this court's precedent. I thought that the board had its own findings of fact. I didn't think... The board what? Doesn't it have its own findings of fact, numbered 1 through 15? Yes, and none of them had anything to do with any of this other than flexibility. Well, it does say that, you know, there's different references that say that it's particularly stringent in specific requirements for coating compositions for can interiors which are different from other coatings. Flexibility and adhesion are essential. And so it was just relying on those fact findings for the idea that if you're going to take Perez and modify it in view of Christensen, you'd want to make sure the coating in Perez is flexible. Not reading into the claims flexibility. Yes, Your Honor, I don't dispute the whole point of this case is the board found that there is a stringent flexibility requirement and I say they found that that requirement was in the claims and they used that requirement to distinguish the Perez reference. My point is that is not a requirement of the claims. Valspar admits that's not a requirement of the claims. Right in their brief, they say very plainly on page 19 that everyone involved agreed on one thing. The claims were not limited to flexibility or other stringent requirements. Now their claims cover a wide array of applications of this coating. They are not limited to a commercial coating. Mr. Figg, can we move on? What about very quickly the Brandenburg Declaration and the problem with the Brandenburg Declaration? The Brandenburg, I see I'm beyond my time here. Please respond. Okay, thank you, Your Honor. The Brandenburg Declaration, again, was the basis for the board's decision on He tried to create example 18 from Perez. He didn't include the wedding agent. That's right. And the board mistakenly thought that the cross-linking agent was the same thing as a wedding agent. The board on its own, we had made the argument that Brandenburg did not accurately reproduce. And our experts said Perez requires a surfactant wedding agent. And that is important. It's important to the very property that is being touted here as so critical, flexibility, because if the coating doesn't adhere well, it flicks away when you bend the substrate. But it requires an emulsion polymerization. You can't have an emulsion polymer without some sort of surfactant. Well, that's not what Perez says, Your Honor. What Perez says is Perez has examples 1 through 18 that describe making the latex, the polymer emulsion. And then it says to formulate these latexes into coatings, you add a cross-linking agent and you add a surfactant wedding agent. And the board clearly made a mistake. Nobody disputes the board made a mistake. It rejected our argument by saying Simel 303 is a surfactant wedding agent. Nobody disputes that's wrong. It's not a wedding agent. Did anyone correct it? It just seems to be such a conspicuous error. It was in the final decision. It was in the final decision, so we didn't have any opportunity to correct it. No one made this argument to the board. The board used this argument that it came up with on its own to reject Dr. Good's testimony that a surfactant wedding agent is important to adhesion, which in turn is important to flexibility. Now, there's a lot of lawyer argument in Valspar's brief about the Perez reference, but the fact is not disputed. The board made a glaring mistake when it said Simel 303 is a wedding agent, a surfactant wedding agent. That argument would just apply to Perez, not to JP 387, right? That's right. JP 387 was, I think the board concluded 387 was, they rejected that simply because it didn't say within its four corners it's flexible, even though our experts said there's really no dispute that it's flexible because, again, it's the same polymer that's claimed in the Valspar patents. Okay, let's hear from the other side, and we'll save you a rebuttal. Thank you. Mr. Smith? Thank you, Judge Newman. What can you tell us about the patent lawsuit that was recently filed on a related patent? I think the way Mr. Figg characterized it as being progeny patents is accurate. Unfortunately, I haven't done a comparison of the claims, but I know the claims are different. I also don't know what PPG is doing commercially, so that's the extent of what I can tell you. I can't do the analysis right now. Right, but Valspar must know something about what PPG is doing because it filed a lawsuit, right? It didn't just blindly file a patent lawsuit, right? Yes, Your Honor. I'm certain Valspar does know something about what PPG is doing, even if in part it is based on testing without discovery or something like that. I don't happen to know that right now. It's not a record. In your brief, you said that there's no Article III standing. Do you maintain that position? Yes, we do. Why? Because there's no injury in fact in this case, and I'll certainly concede— Even with the fact that your client has sued PPG based on related patents for a coating for an air interior of a can? Yes, Your Honor. So is the theory that re-examination requires an Article III controversy? Yes, Your Honor. The theory is that certainly Article III standing is required. Not for the initial re-examination, of course, because that's a statutory right given by Congress, and PPG exercised that and they're allowed to do that even without Article III standing. But once you appeal to this court under the Consumer Watchdog case, you have to meet the Article III standing, particularly— Just the concrete and particularized injury? The injury in fact, right. And the other two are subsidiary to that in this particular case. As we know, the standard for case or controversy is relaxed in these kinds of peculiar situations. How would the facts have to be different than what they currently are in your view that would get PPG over the hump and then therefore have standing at this point in this appeal to challenge the validity of your patent? I think there would need to be a reasonable apprehension of suit. Give me an example. In a licensing negotiation, Valspar serves a claim chart on PPG saying this is why we think you infringed these two patents. Do you think that it's the same standard that somebody would have to satisfy for filing a declaratory judgment action? In terms of injury in fact, yes. I don't think this would pass muster under a declaratory judgment action, but freely admit that this is closer than— They don't need to pass the standards for a DJ action here. We all know that. So there's something less than that. So what in your view would be less than that that would still satisfy the relaxed standing standards in this peculiar situation? Some indication, Your Honor, that PPG has an apprehension of suit under these patents. Kind of like filing a lawsuit against them on the exact same specification? That depends on what the claims say and what PPG's product is. And that was evidence, I think, that PPG could have put into the record as the question was brought out. I don't know how they could have put that into record when you filed suit later, your client filed suit after their reply brief. Well, PPG certainly could have said we have the intention of going forward with something that looks like the claims of this patent or at least that we're considering that. But none of that was put into the record during the proceedings below or even in this court in the reply brief. Could we get a letter maybe from both sides about, okay, what is this lawsuit that's going on? And identify the patent and what's the product? I need to understand before I can figure out what's going on here on the standing question. I think, yes, let's set it aside and not use up your time. But we will accept from both sides no more than three pages. I think three pages are enough of anything you need to tell us about standing under the explicit circumstances of the old law reexamination. Thank you, Your Honor. Okay, let's turn to the merits. On the merits of the case, we view the situation somewhat differently than PPG. I think, fundamentally, it's relatively simple. We had dueling experts in this case on the question of the combinability of the references. And the board credited Valspar's expert, Dr. Brandenberger. That decision was within the board's discretion and supported by substantial evidence. And let me give you what I think is the core evidence in the case that allows you to affirm on the merits, even aside from any question of Simel 303 or testing. And that is, first of all, the board's finding that there are stringent requirements that apply in the can-interior coding field, which I think is supported by undisputed evidence at this point, or largely undisputed evidence. The board's finding that these requirements... Remind me again, what's that evidence? There's a number of pieces of evidence, Your Honor. First, there's Dr. Brandenberger's testimony. And the evidence that we recited in pages 25 to 29 of the opening brief where we cite two patents from PPG, from AXO, prior Valspar patents, all of which say this is a specialty field. It has stringent requirements, including flexibility. And codings that have worked in other fields don't work well in this field. So a person of ordinary skill in the art is already approaching problems in this field a little bit differently than they would approach them anywhere else with a mindset that other codings for other systems, which is what JP387 and Perez are, are not likely to work well here. And beyond that, of course, we have the testimony of Dr. Brandenberger directed specifically to the disclosures of JP387 and Perez detailing why those disclosures and their particular characteristics would have given a person of ordinary skill in the art the affirmative disbelief that these references would actually meet the flexibility requirement or would be formulated to be a can interior coding institution. The 047 decision? Yes. The board doesn't seem to rely on that. It seems to really just be focusing on the experiments that were performed by Mr. Brandenberger. I mean, if you look at his declaration, Mr. Brandenberger has like three or four paragraphs where he says more general things like what you're talking about. But the board doesn't seem to rely on that at all. And instead is just relying on this experiment which seems to have some sort of clear error in it. And the board has a clear error in saying that the cross-linker is also the wedding agent. So how can we rely on other things in Mr. Brandenberger's declaration when the board did not? So let me address that separately for the two rejections. So certainly for JP387 the testing just isn't relevant. And if you read the board's opinion at appendix 30 and 31 they really are saying Dr. Brandenberger testified to the characteristics of JP387 and didn't find those to be particularly suited to this can interior coding field. So it's a little bit different for JP387 and Perez. For Perez, in view of Christiansen, I think you're correct that the board spent a lot of real estate in the opinion talking about the experimentation. But the introduction to the analysis and the ultimate conclusion this sentence right after they talk about the experimentation where they say as a result it comes after the Simel 303 statement what they say there I think is particularly important. They say as a result we credit the statements in the Brandenberger declaration over the statements made in the second good declaration. That's on appendix page 26. Do you agree that Simel is not a wetting agent? With the way you phrased the question, no. I think that the board's finding is actually scientifically accurate. But we will agree that we didn't argue that. We didn't put the evidence in the record  So if there's a substantial evidence basis for that finding, it is in the vagueness of the Perez reference itself. And that is this surfactant wetting agent which is talked about at column 11 lines 14 to 15 follows immediately the discussion of Simel 303 and if the significance that PPG is putting on that surfactant wetting agent as sort of the key to unlocking flexibility is actually there you would have expected Perez to name that surfactant wetting agent and the composition the concentration at which it's used how it's used and so concluding that the previous sentence is actually reintroduced as a surfactant wetting agent at that point in time I think is a plausible thing for the board to do. Now it wasn't my initial reading of that but I think ultimately it doesn't matter. But why was it okay for Dr. Brandenberger to not include a wetting agent when he was purportedly trying to recreate example 18 but he forgot to add an ingredient? Because he can't add it your honor and he can't add it because you don't know what it is Did he say that? There's this thing in Perez example 18 called wetting I don't know how to put that in there No he didn't explain that in the declaration Couldn't he have had he recognized that he needed to include it couldn't he have said just like he did with one of the other ingredients this is the reasonable amount of pound that somebody could put in 5%, 10%, 20% whatever he did I think he did that with respect to the crosslinker he didn't have a specific amount but he used his judgment had he recognized that a wetting agent was needed wouldn't he have done that similar process? It's an extremely difficult thing to do and the distinction between the surfactant wetting agent and the crosslinker if they are indeed different is that the crosslinker is actually named and he has some experience judging what the concentration is to be in order to run these sorts of experiments that you're talking about there are multiple dimensions in which you have to do them you have to take the known universe of surfactants and run across that dimension you have to take the concentrations that are possible and run something that he thinks is reasonable some range and then you have to do the application method and those things are very very difficult to resolve I don't think you could test Perez any better than Dr. Brandenberger did then maybe the test is just not worthwhile but he was looking for flexibility whereas the wetting agent as I understand it related to adhesion to the surface the metal surface so if he was looking for the flexibility of the polymer the wetting agent is not incorporated into the polymer I would have thought that perhaps he in fact had a more specific basis of comparison by using just the polymer and the cross-linking agent I think that's a very important point, Judge Newman there's no evidence in the record anywhere that the wetting agent actually contributes to flexibility remember that Perez is designed to have a coating which has a high glass transition temperature I thought Dr. Goode mentioned something about why the why the wetting is an important part of example 18 and it's repeated at A23 paragraph 13 where the board says Dr. Goode testified that the surface of the metal requires excellent wetting to provide adhesion because adhesion is very important when testing for flexibility right and there are two things I would say to that your honor, first of all what Dr. Goode did not testify to was that the flexibility, he said it will help in the testing of flexibility but there's an important point there which is in this emulsion polymerization system and I disagree with Mr. Fig on this, it is required to have a surfactant in the initial stage, both AOT 75 and the polymeric surfactant, so there's a lot of surfactant and a lot of wetting already in this composition for example 18 the second thing and this is what Mr. Goode did not testify to was that a person of ordinary skill in the art can select the wetting agent, can select the concentration, can select the application method in a way that changes Perez from the sort of flexibility disaster you see in the photographs that Dr. Brandenburger took to something that will actually work for an application that is not disclosed in Perez for the can interior coating field, there's no evidence of record that that's even possible Dr. Goode didn't testify to that, and so if one is going to test Perez, this is about as well as one could do, this is up to the limits of what Perez actually discloses and I think that's the fault of Perez it's not the fault of the test. The Perez coating composition, it's within the scope of your patent claims, right? For the independent claims, your honor, it's within the compositional part of the scope, yes. Okay. I think that you were saying that the board credited the statements made in the Brandenburger declaration over the statements made in the Goode declaration, but isn't that don't we have to read that as being as a result and then look at the sentence before that? To understand that it's being credited as a result of the testing that was done? So I think that there are two different questions maybe that your honor is asking, but one is can we read the board's opinion as referring to the entire Brandenburger declaration, right? And I think given the introduction to the analysis section where they say in view of the arguments and evidence of record and also in view of the earlier statement that the board makes which is that the Brandenburger declaration contains testimony and testimony about experimentation, this is OPPX 20, I believe that the board is actually reviewing and crediting the entire Brandenburger declaration. Now they talk a lot about the experimentation and I think that's because a lot of the party's argumentation was over the experimentation but even though it's thin, I think what the board is actually saying is we credit the statements made in the Brandenburger declaration over the statements made in the Goode declaration and you can view the experimentation as a credibility enhancement of that. So in other words, they believe Dr. Brandenburger in part because Dr. Brandenburger actually tested it whereas PPG did not test it. Are we talking about the JP 387 rejection right now? No, we're talking about actually Perez and Christensen. At the end of that paragraph on appendix page 26 where they're talking about the experimentation and they conclude as a result. Right. And so let's just assume for the moment we've got a problem with the Brandenburger testing of example 18 and there was an over-reliance on a misunderstanding of whether Brandenburger actually followed the full recipe in example 18. Then when we get over the JP 387 analysis, it looks like the board does something of a shortcut to the finish line and says we look at Dr. Brandenburger's declaration, we look at Dr. Goode's declaration, we find Dr. Brandenburger's declaration is more persuasive and so therefore we reverse the rejection. It that analysis likewise seems exceedingly thin especially if we have a problem with at least a major aspect of Dr. Brandenburger's declaration. There's a critical aspect of the board's opinion in which they state they credit Dr. Brandenburger's testimony over that of Dr. Goode because it's consistent with the prior art. And there are many aspects of Dr. Brandenburger's testimony which are consistent with what they were seeing in the prior art, particularly the prior art that was coming from PPG saying this is a specialty field with stringent requirements where other compositions don't work well. And Dr. Brandenburger's testimony in his declaration also addresses JP 387 specifically and says look this is a general coding thing, this is a general coding composition. It's directed to things like leather processing, paper processing, per the express terms of the specification in JP 387. A person of ordinary skill working in this field this almost undisputedly acknowledged specialty field with stringent requirements is not going to view this general coding as potentially applicable to a can interior coding. They're going to say this is probably not going to work and maybe I'm going to test it or something else but they're not going to go in with a reasonable likelihood of success for the reasons in Dr. Brandenburger's declaration. That would have made me more comfortable if the board actually said that. What the board did say was that they were crediting Dr. Brandenburger's declaration because Dr. Brandenburger's declaration was more consistent with the prior art. When you pair that with the board's earlier fact findings regarding the stringent requirements in the field and regarding the differences between this field and other fields and other coding compositions, I think you'd get to that point. Any more questions? Thank you very much. Thank you, Mr. Smith. Mr. Figg. Thank you. The argument is this is a specialty field and the codings have to be flexible. Yet, the preferred embodiments in the patent application admittedly are not flexible. We pointed out that the flexibility test in the Valspar patents is a reverse impact test. They said the most preferred codings or the more preferred codings pass that test. But preferred codings do not pass that test. Those are embodiments of their claims. How can they distinguish a reference for lack of flexibility when the preferred embodiments in their own patent don't have this alleged requirement? Can you point me to that in the patent? I'm sorry? Can you point me? Yes, appendix page 26, column 22, lines 16 and 17 say that preferred codings tell me when you're there. I'm sorry, could you say it again? Yes, column 22 of the appendix page 26, I believe. I'm kind of working from memory here. That's fine, column 22 of 876 Line 16 and 17 says preferred codings have one or more of the properties identified in the example section. Now, if you read the example section, properties that are emphasized and identified separated by headings are coding continuity. This is whether there are pinholes in the coding. Good adhesion. Blush resistance, which is water resistance. Detergent resistance. And flexibility determined by the reverse impact test. They say only one or more of those is required. Now, Perez clearly has one or more. We actually think Perez has all of them, but for purposes of this dispute, Perez, it's admitted, has one or more of those properties. If you go on to the examples, and we reproduced this in our brief, Your Honor, the examples clearly cover embodiments that failed this reverse impact test, which the patent says is the test used in the patent for flexibility. Did I respond to your question, Your Honor? The  the board credited Dr. Brandenburger over Dr. Good is simply overlooking why did they credit him. They credit him because they rejected PPG's argument that Brandenburger left out the surfactant wetting agent. They concluded that Brandenburger didn't leave it out because he put Simel in. But nobody disputes that was a clear mistake. That was the only reason they said they credited Dr. Brandenburger over Dr. Good. Now, Dr. Good testified that the inclusion of a wetting agent is important in these kinds of coatings because it causes uniformity, it causes good adhesion of the coating to the substrate. He said that is important when testing for flexibility. What that means is if you bend the substrate and the coating doesn't adhere well, it flakes away. That's exactly what Dr. Brandenburger showed in his photographs. We don't know why Dr. Brandenburger left this out, but the arguments counsel made were not arguments Dr. Brandenburger made. This was pointed out in Dr. Good's declaration that he left out the surfactant wetting agent. He never said, well, I don't know what it is, or I don't know how much to use, or maybe he's talking about a surfactant that was in the upstage latex production. All that's lawyer argument. None of that was in Dr. Brandenburger's declaration. Let me address your point, Judge Stoll, about to what extent did the board rely on things other than flexibility and other than Brandenburger's test results. The board cited to numerous paragraphs of the Brandenburger declaration not one of those paragraphs that it cited dealt with any of these other issues other than flexibility, and the very first paragraph that just said this is a specialized field that has stringent requirements. They relied entirely on the alleged insufficient flexibility of Perez, and they relied entirely on Dr. Brandenburg's testimony. They didn't. Under the Administrative Procedures Act, the board has an obligation to explain what they're basing their decision on. They never mentioned any of these other features, any of these teaching away arguments, anything other than the alleged insufficient flexibility and the fact that they concluded Brandenburger demonstrated it. But he demonstrated a property that... Just to clarify, you're out of time, but Mr. Figg, you'll be sending in a three-page letter too, right? Yes. Because that is going to be critical for me. Yes, I appreciate that, Your Honor. If I might just take ten more seconds, we found numerous cases where requesters or IPR petitioners have appealed, and this issue never came up. We, frankly, were surprised it came up. We're in a post-consumer watchdog world. No, but even after consumer watchdog. Consumer watchdog, by the way, was decided after all the briefing went in. So I appreciate the opportunity we have. Okay, now to be clear, let's just pick a date. Let's say November 15th. That's two make sense to both of you? Okay. Thank you. Okay, that concludes the argued cases for this morning. All rise.